| | |
|---|---|
| THOMAS PENN, JR., DELBERT HAIRSTON, JR., GERROD HARDY, RICKY BROWN, and EDDIE FORREST,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF WINSTON-SALEM and WINSTON-SALEM FIRE CHIEF WILLIAM MAYO, an Individual,<br><br>Defendants. | CIVIL ACTION NO. _____ |

## PLAINTIFFS' ORIGINAL COMPLAINT

**COMES NOW** Plaintiffs Thomas Penn, Jr. ("Penn"), Delbert Hairston, Jr. ("Hairston"), Gerrod Hardy ("Hardy"), Ricky Brown ("Brown"), and Eddie Forrest ("Forest") (collectively "Plaintiffs"), by and through undersigned counsel, and in support of their causes of action allege as follows:

## PARTIES

1. Each plaintiff is an individual citizen of the State of North Carolina who currently or recently worked for the City of Winston-Salem Fire Department ("WSFD").

1

2. Defendant City of Winston-Salem (the "City") is a municipality organized under the laws of the State of North Carolina.

3. Defendant William Mayo ("Chief Mayo") is an individual, and the Chief of the Winston-Salem Fire Department. Chief Mayo is the highest-ranking employee in the Winston-Salem Fire Department.

## JURISDICTION AND VENUE

4. This action arises under United States Code, Title 42, § 1981 *et seq*.

5. Venue properly lies in this Court because all acts and omissions giving rise to this claim (specifically the employment decisions addressed herein) took place in Forsyth County, North Carolina, which is in the District and Division in which suit has been filed.

## FACTS AND GENERAL ALLEGATIONS

Overview

6. The City is a municipality in North Carolina. It is the fourth largest city in North Carolina, with an estimated population of approximately 250,000.

7. According to the United States Census, the City's population is 46% European-American (non-Hispanic/Latino) and 34.8% African-American.

8. The City operates WSFD, a professional, full-time fire department of nearly four hundred (400) employees employed at nineteen (19) stations. Contrary to expectations, WSFD employees are overwhelmingly European-American, with African-Americans typically comprising approximately 15% of the workforce. Moreover, the percentage of African-Americans who hold senior, officer-level positions rarely exceeds 10%.

9. As with most professional (as opposed to volunteer) fire departments, most employees are assigned to Stations, where the employees live and work while on duty, including eating, sleeping, bathing, and socializing.

10. Prior to joining the WSFD, applicants must pass a series of tests and evaluations. Those include a multi-week program called "Rookie School," where recruits are trained and tested on a variety of tasks and protocols. Only after successfully completing Rookie School can a recruit be assigned to a Station.

11. WSFD has a decades-long history of discrimination, harassment, intimidation, and retaliation against African-American employees. As described below, African-Americans are (a) discouraged from applying for positions, (b) more rigorously tested, scrutinized, and criticized

during Rookie School, (c) harassed, belittled, and demeaned, at Stations, (d) denied promotional opportunities, and (e) targeted, transferred, and ostracized if they complain about the discriminatory behavior.

12. African-American WSFD employees have complained to WSFD and City administrators, to no avail. Those complaints have been ignored or, worse, the basis for less favorable assignments and treatment.

13. In instances when a complaint has been found to be valid, the offending WSFD employee has been transferred to a new station, not subject to any more meaningful discipline. The systemic protection of employees guilty of harassment and discrimination has created and fostered an environment where federally-protected rights are violated with near impunity.

14. Lacking any redress or other remedy, Plaintiffs now file this suit alleging race discrimination, harassment, and retaliation.

Failure to Prevent and Correct Discriminatory Behavior

15. Contrary to the requirements outlined by the U.S. Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998), the City and

4

WSFD have failed to take steps to prevent or correct discriminatory behavior in WSFD.

16. Specifically, Chief Mayo directed a complaint of discrimination and harassment be referred to a Chaplain, rather than investigated.

17. Chief Mayo, when confronted with an instance when a noose was tied during a training class, directed that the person move to a different topic, specifically stating "Next topic" rather than address the event.

18. Chief Mayo has openly stated that he is "tired of hearing about diversity."

19. When Plaintiff Captain (Ret.) Ricky Brown publicly discussed his experiences of discrimination and harassment with WSFD, Chief Mayo approached Plaintiff Brown and whispered into Plaintiff Brown's ear that Plaintiff Brown "should be ashamed" for his support and participation in opposing discriminatory and harassing behavior at WSFD.

20. WSFD historically has not required attendance at diversity, inclusion, or similar training events for WSFD firefighters.

21. Officers and supervisors, who observe or learn of offensive, harassing, and/or discriminatory behavior, have failed to address the

events or report the events to more senior staff with WSFD and/or the City.

22. African-American firefighters are told that complaints will "go nowhere" or otherwise will not result in any action, and thus are discouraged from raising complaints or pursuing grievances against European-American firefighters and officers.

23. In a separate lawsuit filed in this Court by Plaintiff Thomas Penn, Plaintiff Penn alleged racially discriminatory and harassing behavior by the City and WSFD. This case was settled. Subsequent to settlement of his claim, Plaintiff Penn was denied an opportunity to use his annual leave allotment as was customary for WSFD firefighters.

24. In another instance, an African-American firefighter complained about his treatment when he returned to work from active military service. His complaint to the City Attorney's Office under the Uniformed Services Employment and Reemployment Rights Act (USERRA) was ignored. When a European-American firefighter made a similar request when he returned from active duty, the City and WSFD granted his request. When the African-American firefighter learned of the discriminatory treatment and reiterated his complaint to

6

the City Attorney's Office, he was summarily dismissed because the statute of limitations for a USERRA claim had passed.

25. When African-American firefighters make complaints, often WSFD transfers the complaining firefighter and leaves the alleged offender in place. Often, these African-American firefighters are transferred to less desirable fire stations within WSFD.

26. When African-American firefighters complain about discrimination and/or harassment, they also face retaliation and retribution in the form of rumors that the African-American firefighter is "untrainable" or "lazy."

27. When African-American firefighters approach a supervisor with a request to file a grievance or other complaint, the African-American firefighter is asked if he is sure he wants to do so, because doing so may adversely impact his career and future promotional opportunities.

28. During investigations involving African-American firefighters as witnesses, European-American firefighters, including Chief Mayo, often contact African-American firefighters off-duty to discuss the investigation. Such off-duty conversations are informal, rather than part of the formal investigation process, and are perceived by the African-American firefighters as efforts to intimidate them.

29. The absence of formal complaints, the refusal by the City and WSFD to address complaints, and the lack of discipline resulting from filed grievances and complaints has created an environment where certain WSFD firefighters and officers have been emboldened to the point where they act with impunity and have an aura of being "untouchable."

30. When the City commissioned a "Climate Study" to assess the working conditions at the WSFD, the Climate Study first was falsely labeled an investigation. It is not

31. When the Climate Study commenced, WSFD selected specific individuals to be interviewed. Shockingly, WSFD selected its key offenders, harassers, and discriminators to speak to the climate within the WSFD.

32. Under the circumstances, it came as no surprise when WSFD failed or refused to select aggrieved employees to speak to the climate within the WSFD during the Climate Study. To further suppress the voices and experiences of its African-American firefighters, WSFD failed and refused to advise its African-American employees that they could volunteer to be interviewed for the Climate Study.

8

Specific Instances of Discriminatory Behavior

33. In one instance, Michael Chapman ("Chapman"), a WSFD firefighter, attended a class on ropes and knots taught by Captain John Lindholm ("Lindholm"). During the class, Chapman demonstrated how to tie a noose.[1] Chapman showed the noose to Darius Johnson, an African-American firefighter, and asked Johnson if he knew what it was. There is no work-related use or purpose for demonstrating how to tie a noose. Lindholm took no action against Chapman in response to his offensive behavior. Instead, Chapman became an Instructor shortly thereafter.

34. WSFD Captain Lindholm, Battalian Chief Daryl Sawyer, and Chief Mayo were made aware of Chapman's racially-offensive conduct. They did nothing in response. In a meeting when this issue was raised, Chief Mayo specifically directed the conversation move to a new topic.

35. Captain Dwayne Jernigan repeatedly and openly said "Nigger" while on duty and at the fire station. Nothing has been done in response.

---

[1] A noose is a symbol strongly connected with the violent lynching of African-Americans, particularly in the southeastern portion of the United States.

36. WSFD regulations prohibit promoting employees who are under investigation or recently received a reprimand, within 365 days. Despite that, WSFD promoted Jason Gore, a European-American, in direct contravention of WSFD promotion procedures.

37. In 2019, Captain Eddie Forest filed a racial discrimination complaint against Assistant Operations Chief Jerry Hardisson and Division Chief Robert Wade. Chief Mayo allegedly conducted an investigation, but failed (or refused) to interview key witnesses.

38. Captain Forest expressed dissatisfaction with Chief Mayo's investigation and requested a hearing at a higher level. As of the filing of this lawsuit, Captain Forest continues to wait for a formal hearing on his complaint.

39. Michael Walker, Jr. was an African-American recruit in Rookie School he was denied an opportunity to take the state certification exam and, as a result, he could not complete Rookie School or become a WSFD firefighter. The basis for denying Mr. Walker an opportunity to complete Rookie School was his failure to tie a specific knot, despite the fact that knots and ropes are rarely used by WSFD firefighters. In another instance, Brian Reid successfully tied required knots multiple times and was required to tie the knots repeatedly. Once he failed to

10

tie the knot correctly, despite previously doing so moments earlier, his failure was used as a basis for dismissing him from Rookie School. Conversely, when European-American recruits fail to pass critical Emergency Medical Technician (EMT) exams, they are provided assistance in order to complete Rookie School.

40. In 2010, Captain Dwayne Jernigan's wife, Captain Kelly Jernigan, wrote a response piece for FireEngineering.com, titled *Less Diversity Is Needed in the Fire Service*. Shockingly, Captain Dwayne Jernigan assigned his wife's inflammatory and racially-offensive piece as required reading for a WSFD employee.

41. Sabrina Stowe, an African-American employee, filed a grievance about pay inequities. While the inequality she alleged was confirmed, her grievance was denied and she was denied compensation. European-American employees, like Captain Christopher Belcher and former Administration Chief Marlene Kostyrka, however, have received multiple pay increases to compensate them for pay inequities.

42. When Captain Belcher failed to respond to a call, he suffered no discipline. When Captain Grady Armstrong (African-American) was accused of the same violation, which was determined to be unfounded, he was demoted two positions.

11

43. When Captain Willie Griffin was cited for Driving While Impaired, WSFD demoted him two positions from his non-driving Captain position to the rank of Firefighter. By contrast, European-American Engineer David Pollard was cited, upon information and belief, three separate times for Driving While Impaired. Because his position did involve driving, Pollard was granted sick leave and then permitted to retire with no discipline or reprimand.

44. When Engineer Perez Wardlow reported to his new station in 2018, he found a gorilla mask on his desk. Despite his repeated requests and complaint, no investigation ever occurred. In other instances, European-American firefighters have placed monkeys on helmets belonging to African-American firefighters.

45. In mid-2020, Captain Belcher taught a combination online and in-person class on dealing with protestors during the protests in response to policy brutality. In the in-person class, Captain Belcher stated that he could solve the problem during his drive home through downtown; his proposed solution was to use his vehicle to assault the protestors. This is particularly offensive in light of the events in Charlottesville, Virginia in August 2017, when James Alex Fields, Jr. similarly drove a vehicle into an anti-racism protest. Mr. Fields killed

12

one person and injured dozens of others, resulting in his guilty plea to 29 federal hate crime charges.

46. African-American firefighters routinely are harassed for their failure to adhere to the WSFD dress code. European-American firefighters are not counseled or disciplined for similar or worse offenses under the WSFD dress code.

47. The City has implemented an Equal Employment Opportunity policy. That policy requires all employees enjoy equal standing and equal opportunity. Specifically, the policy creates a right for employees to use the grievance process and an obligation by the City to investigate complaints. The reality is the policy is rarely enforced, complaints often are ignored, and offenders suffer no discipline.

48. For example, in June 2020, Firefighter Jonathan McDaniel confirmed that he was uncomfortable as the only African-American firefighter at his station, and comments were being made by Captain Shore, Chief Mayo was advised of the concern and suggested the Department Chaplain speak to Firefighter McDaniel. The issue, however, was not one of religious connotation or importance but, rather, race discrimination.

49. Captain Shore has a history of leaving African-American firefighters at the station when taking calls. These incidents have occurred on at least four (4) occasions under Captain Shore. Captain Shore's supervisors have been made aware of these incidents, without any discipline or reprimand. Instead, Captain Shore has been identified as the candidate to assume responsibility for the Firefighters' Retirement Fund.

50. The City also has a policy against making harassing or threatening statements while at work. WSFD employees, however, routinely post threatening, harassing, and offensive statements on social media while at work. Such unprotected and offensive speech includes:

    a. In a public conversation, Marcia Dudley, a Lowe's Home Improvement employee, suggested moving African-Americans "back to africa [sic] or wherever they all come from" and African-Americans "should be thankful that SLAVES were brought over." In response, Captain Kevin Shore responded favorably to the post and Firefighter Jacob Pardue further responded that "they're [African-Americans] ignorant of their history." Lowe's terminated Marcia Dudley for her public

14

comments; WSFD and the City did nothing in response to Shore and Pardue's public support for her comments.

b. Captain Kelly Jernigan suggested authorities unleash German Shepherds in response to Black Lives Matter protests, resurrecting tactics deployed by police against civil rights protestors in the 1950s and 1960s.

c. Firefighter Matthew King posted that the National Association for the Advancement of Colored People (NAACP), Black Entertainment Television (BET), the Hispanic Scholarship Fund, and even the Democratic Party represent racism in the United States to the same extent the Confederate flag does. In response, Captain Charles Goins (African-American) corrected Matthew King, noting the connection between the Ku Klux Klan and use of the Confederate flag symbolism. Firefighter King refused to acknowledge his publicly-displayed racially-offensive post, reaffirming his belief.

d. Captain Edward Scott Blair, during anti-police brutality protests in Charlotte, publicly posted that he was going to Charlotte for "supper" and bringing his own "silverware." The

15

Case 1:21-cv-00123-UA-JLW   Document 1   Filed 02/11/21   Page 15 of 20

silverware to which he referred is three handguns pictured with the post.

e. During a similar protest in Greensboro, a private citizen suggested carrying a firearm for such incidents. Captain Blair later posted that the "saint is a very good platform for such situations." The "saint" is commonly used to refer to the assault rifle AR-15. Captain Blair further explained his comment that the "saint" is "Compact… easily concealed and deployed…" and has a "muzzle break with 50% recoil turn down." To avoid any doubt as to his reference, Captain Blair then noted that he was "talking like a '2nd amendment' dude."

51. Regardless of any policy implemented at any time, WSFD maintains a strict policy related to conduct unbecoming of an officer. Such statements, posted for public view, comment, and consumption, including by African-American subordinates of these officers, are offensive to the staff the above-listed officers supervise and manage. The City and WSFD have taken no action in response to these posts.

## CAUSES OF ACTION

*Cause of Action No. 1: Race Discrimination
in violation of 42 USC Sec. 1981*

16

52. Plaintiffs reassert and, by this reference, incorporate the allegations contained in paragraphs 1 through 33, above, as if fully set forth herein.

53. Plaintiffs have been subjected to unequal pay, unequal treatment, unequal promotion and hiring opportunities, and unequal discipline in their work with the City.

54. Such discriminatory behavior has been the result of racial bias and discrimination within the City, specifically at WSFD. But-for the race of the Plaintiffs, such behavior would not have occurred.

55. As a result of Defendant's actions, Plaintiffs suffered and continue to suffer damages and Plaintiffs hereby sue.

56. Plaintiffs further seek their attorneys' fees incurred in bringing this action.

### *Cause of Action No. 2: Retaliation*
### *in violation of 42 USC Sec. 1981*

57. Plaintiffs reassert and by this reference incorporate the allegations contained in Paragraphs 1 through 38, above, as if fully set forth herein.

58. Plaintiffs have complained and supported the complaints of others in opposition to the racially discriminatory conduct fostered and tolerated by the City and WSFD.

59. In response to their complaints and support for the complaints of others, Plaintiffs have been ostracized, more heavily criticized, scrutinized, and disciplined, denied promotional opportunities, and received less favorable or desirable job assignments and transfers.

60. As a result of Defendant's actions, Plaintiffs suffered and continue to suffer damages and Plaintiffs hereby sue.

61. Plaintiffs further seek their attorneys' fees incurred in bringing this action.

## JURY TRIAL DEMAND

62. Plaintiffs demand a trial by jury on all issues of facts and damages raised in this case pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

**WHEREFORE**, cause having been shown, Plaintiffs respectfully requests that, upon final hearing, the Court award Plaintiffs judgment against Defendant for:

a. Back pay and front pay in a precise amount to be determined by the jury;

b. Compensatory damages against Defendant as a consequence of Defendant's unlawful actions, in a precise amount to be determined by the jury;

c. Actual damages;

d. Prejudgment and post-judgment interest;

e. Reasonable attorneys' fees, expenses and costs, as specifically authorized by statute, to be calculated by the Court pursuant to the established procedures and precedents; and

f. Such other relief as the Court shall deem just and proper.

Dated: November 25, 2020.

        Michael E. Coles, Lead Counsel
        TX State Bar No. 24007025
        **THE COLES FIRM PC**
        4925 Greenville Ave., Suite 200
        Dallas, Texas 75206
        Telephone: (214) 443-7860
        Facsimile: (972) 692-7145
        mikec@colesfirm.com

        Miguel A. Cuadra Jr.
        NC State Bar No. 50329
        **The Law Offices of Miguel A. Cuadra PLLC**
        315 Spruce St. North, Suite 275
        Winston-Salem, NC 27101

Telephone: 336.695.7760
Facsimile: 336.722.5680
macj@miguelcuadralaw.com
**ATTORNEYS FOR PLAINTIFFS**